IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

DAWN MAGGARD and DARRELL MAGGARD, )
individually and as next friends and parents of )
Holly Maggard and Audrey Maggard, )
HOLLY MAGGARD, and AUDREY MAGGARD, )
                                                        )
    Plaintiffs,                             )   Civil No. 3:05-0369
                                                        )   Judge Trauger
v.                                                      )
                                                        )
FORD MOTOR COMPANY,                         )
                                                        )
    Defendant.                              )

## MEMORANDUM and ORDER

Defendant Ford Motor Company has filed a Motion For Judgment As a Matter of Law Or, in the Alternative, For a New Trial Or, in the Alternative, a Remittitur of the Jury's Verdict (Docket No. 141), to which the plaintiffs have responded (Docket No. 148), and Ford has replied (Docket No. 159). The motion is made under Rules 50 and 59 of the Federal Rules of Civil Procedure.

### Standard

This is a diversity case. Therefore, a motion made pursuant to Rule 50, FED. R. CIV. P., must be decided by applying the forum state's substantive standard for determining when judgment as a matter of law is appropriate. *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 405 (6th Cir. 2006). In ruling on a motion to set aside a jury verdict under Tennessee Rule of Civil Procedure 50.02, the court must "take the strongest legitimate view of the evidence in favor of the opponent of the motion, allow all reasonable inferences in his or her favor, discard

1

all countervailing evidence, and deny the motion when there is any doubt as to the conclusions to be drawn from the evidence." *Mercer v. Vanderbilt Univ., Inc.*, 134 S.W.3d 121, 130-31 (Tenn. 2003).

In order to grant a new trial under Rule 59, FED. R. CIV. P., after a jury trial, the court must find that "a jury has reached a 'seriously erroneous result' as evidenced by [ ] (1) the verdict being against the weight of evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, i.e., the proceedings being influenced by prejudice or bias." *Mike's Train House, Inc.*, 472 F.3d at 405 (quoting *Holmes v. City of Massillon*, 78 F.3d 1041, 1045-46 (6th Cir. 1996).

The defendant filed a 33-page opening brief in support of its motion (Docket No. 143) and a reply brief of 25 pages (Docket No. 159). Because the defendant's briefs basically follow the outline of 19 grounds for this motion, set out numerically in the motion itself (Docket No. 141), the court will address the defendant's arguments in the order listed in the motion. As additional background, in a lengthy pretrial conference, the court ruled on 13 motions in limine filed by the plaintiffs and 14 motions in limine filed by the defendant (Docket No. 114), many of which rulings the defendant seeks to revisit on this motion.

## Analysis

**Ground 1: Plaintiffs failed to meet their burden of establishing that the 1999 Ford Windstar was defective or unreasonably dangerous when the vehicle left Ford's control.**

Having reviewed the proof at trial and applied the standards detailed above, this court cannot find that the jury's finding in this regard should be set aside under either Rule 50 or Rule 59, FED. R. CIV. P. The plaintiffs carried their burden of proof on this issue.

2

**Ground 2**: **The court refused to allow the jury to consider Ford's verdict form which contained the accurate burden of proof for Plaintiffs in this product liability suit, i.e., that they must establish by a preponderance of the evidence, that the 1999 Ford Windstar was defective or unreasonably dangerous when the vehicle left Ford's control.**

The instructions given to the jury accurately reflected the various burdens of proof and made clear that the defendant could not be liable under a theory of strict liability unless the plaintiff carried its burden of establishing by a preponderance of the evidence that the product was in a defective condition or unreasonably dangerous at the time it left the manufacturer's control. (Docket No. 134 at 14, 23)

General verdict forms are the norm under Rule 49, FED. R. CIV. P. Moreover, the form of the verdict and whether or not to use a special verdict form is left to the sound discretion of the trial court. *Workman v. Frito-Lay, Inc.*, 165 F.3d 460, 465 (6th Cir. 1999). A new trial will only be required if the instructions and verdict form, taken together, are "confusing, misleading and prejudicial." *Hostetler v. Consol. Rail Corp.*, 123 F.3d 387, 393 (6th Cir. 1997). They were not here.

**Ground 3**: **The compensatory damage awards were excessive under Tennessee law and violative of the Due Process Clause of the United States Constitution.**

The jury awarded compensatory damages in the amount of $3.3 million to plaintiff Dawn Maggard and loss of consortium compensatory damages to her husband, Darrell Maggard, in the amount of $100,000. (Docket No. 135) Because the jury found Dawn Maggard 20 percent at fault under Tennessee's comparative negligence scheme, those damage awards would be reduced proportionately.

3

At the time of the accident, Dawn Maggard was an attractive 48-year-old mother of two young daughters and had been married to the same husband for 16 years. She was employed, variously, in child care work, as a medical assistant, and as a server in a restaurant. She was athletically active (rock climbing, repelling), and the hiking that she did helped her back problems, for which she took pain medication. In the accident, the Ford van rolled over Dawn Maggard's right leg and foot. That leg was amputated below the knee, and she must wear a prosthetic for the rest of her life. The first prosthetic cost $11,000, it must be replaced periodically, and models that allow a person to fast walk, as she would like to be able to do, cost upwards of $20,000. Ms. Maggard continues to experience pain and phantom pain. She was in the hospital for eight or nine days and incurred over $66,000 in medical expense from that hospitalization and follow-up treatment. She could not walk using the prosthetic for six months. She is self-conscious around her husband, and her disfigurement has affected their intimacy.

Plaintiffs' counsel, in argument, made no specific request for a dollar amount of compensatory damages, either for Dawn Maggard or for her husband. Although no economist testified for the plaintiff, the court does not find the compensatory damages award unreasonable, excessive or unsupported by the evidence. Nor does the court find it a product of bias or prejudice.

**Ground 4: The 1999 Ford Windstar was not unreasonably dangerous, as it was undisputed that Ford complied with all applicable government standards.**

Under Tennessee law, compliance with government standards creates a rebuttable presumption that the product is not unreasonably dangerous. The presumption is not conclusive,

4

however, and the jury obviously found the presumption rebutted. The instruction given to the jury on this point was an accurate statement of the law. (Docket No. 134 at 22)

**Ground 5**: **It was undisputed that Ford incorporated customary industry designs, standards and techniques in its design of the 1999 Ford Windstar.**

Again, this creates only a rebuttable presumption, not a conclusive one, and this point was adequately covered in the same instruction as the instruction on government standards. (*Id.*)

**Grounds 6 and 7:** **The plaintiffs' expert's theories were untested, unsupported, unreliable, generated entirely in the course of litigation, and were insufficient to have supported the jury's verdict.**

This issue was extensively briefed in motions in limine and discussed and ruled on at the pretrial conference. (Docket No. 114) The reasons for the court's rulings were expressed on the record at the pretrial conference, and the court finds no reason to reverse those rulings post-trial. Moreover, the plaintiffs' expert's theories were adequate, when coupled with Ford's concessions and stipulations (discussed below), to support the jury's verdicts.[1]

**Ground 8**: **The court erred in excluding Ford's experts' opinions that Dawn Maggard pulled the gear shift into Reverse.**

This issue was extensively discussed at the pretrial conference and ruled on as a motion in limine. In order for Ms. Maggard to have pulled the gear shift into Reverse, the engine had to have been turned off. Ford's counsel conceded that not one witness stated that the engine had

---

[1]The arguments made by Ford in a footnote to its reply brief on this motion (Docket No. 159 at 8, n.1) are without merit. These issues were either addressed by the court in ruling on motions in limine, or Ford failed to make objections to the testimony at trial and, therefore, waived any objection.

5

been turned off. (Docket No. 114 at 20) Moreover, Ford's theory, as expressed in the Joint Pretrial Order, filed one week before the pretrial conference, stated: "Plaintiff Dawn Maggard was injured because she got out of the Windstar, *leaving its engine running*, and without putting it in Park, without removing the key from the ignition or without setting the parking brake, any one of which alone would have prevented this accident from occurring." (Docket No. 111 at 6) (emphasis added) Therefore, there was no factual basis for this theory, and it was contradictory of the theory that Ford had apparently elected to pursue at trial.[2] The court properly ruled that allowing Ford to present an alternative theory for which there was no factual basis would be confusing to the jury. (*Id.* at 20)

**Ground 9: The court erred in precluding the investigating police officer from testifying at trial concerning statements made to him by Holly Maggard.**

Ford maintained that Holly Maggard had told Officer Capps that her mother had slipped getting into the car and pulled the gear shift from Park to Reverse. Ford proposed to introduce these statements of Holly Maggard in its case-in-chief through Officer Capps as either an admission of a party opponent or as an excited utterance, and the plaintiffs had filed a motion in limine to exclude this evidence. The plaintiffs had been allowed to drop Holly Maggard as a party plaintiff; therefore, this statement could not have been admitted as an admission, and the court so ruled at the pretrial conference. The court also ruled that, given the fact that this statement was made to the officer 30 to 40 minutes after the accident, when Holly was down the

---

[2]Simultaneously with the filing of its reply brief on this motion, Ford filed a Motion to Amend the Joint Pretrial Order to strike from its theory set out in the Joint Pretrial Order this language that Dawn Maggard left the engine running. (Docket No. 160) By separate order, this motion is being denied.

6

street at a neighbor's house and not still in the emotional state in which she undoubtedly was at the time of the accident itself, the court also found that it did not qualify as an excited utterance. The court did rule, however, over the plaintiffs' objection that, if Holly Maggard denied making this statement to Officer Capps, the defense could impeach her with leading questions concerning what would then be an inconsistent statement. That is how the matter was left at the pretrial conference.

At trial, the defense did call now 13-year-old Holly Maggard to testify. She claimed not to remember what she told the police officer and denied that she could have made the statements because she was not in a physical position to have seen her mother slip and pull the gear shift from Park to Reverse. (Docket No. 156 at 124-125) Following that testimony, the defense wished to call Officer Capps "generally to establish that he did investigate this accident, that he talked to people at the accident scene. . .that he had a duty to accurately record information . . ." (Docket No. 156 at 138) Defense counsel erroneously presumed that, because the court had ruled that Officer Capps could not introduce Holly Maggard's statements to him as admissions or excited utterances, that he also would not be allowed to introduce the statements as extrinsic evidence of inconsistent statements under FEDERAL RULE OF EVIDENCE 613, after Holly denied them. In fact, this evidence rule had not been discussed at the pretrial conference, and the court did not rule at the pretrial conference that Officer Capps could not testify to Holly Maggard's statements if she denied or could not remember them, in that the court was not asked to address that eventuality. At any rate, when the issue arose at trial, defense counsel did not direct the court's attention to Rule 613, and the court, perhaps in error, foreclosed Office Capps from testifying about Holly Maggard's statements to him following the accident. Given that she

7

claimed not to remember what she told him, if Officer Capps could have clearly testified to what Holly Maggard told him, he probably should have been allowed to give that testimony as extrinsic evidence of an inconsistent statement under Rule 613.

This court, however, does not find this ruling so serious or unfair to defendant Ford so as to warrant setting aside the verdict and ordering a new trial. In preparation for the pretrial conference, the court had read Officer Capps' deposition. (Docket No. 114 at 12) Although, in some places, Officer Capps stated that Holly Maggard told him specific things, in other parts of the deposition, he stated that he was not sure who told him what because he was talking to lots of different witnesses in a short timeframe. In all likelihood, given his cloudy recollections reflected in his deposition, Officer Capps would not have been able to remember specifically what 10-year-old Holly had told him some three years earlier. Moreover, even if he had remembered clearly what she had told him, the extrinsic evidence would come into evidence only for impeachment purposes, not as substantive evidence,[3] and, upon request, the court would have given an instruction to that effect at the time that the testimony was offered. For all of these reasons, the court does not find this potential error on its part harmful or determinative of the case one way or the other.

**Ground 10: The court erred in excluding evidence relating to Dawn Maggard's second accident in the 1999 Ford Windstar.**

---

[3]Because Holly's statements to Office Capps were not under oath, they are hearsay. Rule 801(d)(1), FEDERAL RULES OF EVIDENCE. Moreover, they do not qualify as any hearsay exception. Rules 803-804, FEDERAL RULES OF EVIDENCE. Therefore, these statements would only be admissible for impeachment purposes.

8

This issue was raised in a motion in limine and thoroughly discussed at the pretrial conference (Docket No. 114) at 35-37. The defendant gives absolutely no legal support for its contention that the second accident is admissible evidence to prove that Dawn Maggard has a bad memory or states that cars do things on their own that they cannot possibly do. The court properly excluded this evidence under Federal Rule of Evidence 404(a) and (b). All parties agreed that the fact that the van had been in an accident some seven months after the incident in question prevented it from being inspected or driven in some ways by the various expert witnesses, and that aspect of the second accident came into evidence at trial.

**Ground 11: The court refused to allow the jury to consider the punitive damage award instructions submitted by Ford.**

Ford submitted 37 pages of instructions solely related to punitive damages. (Docket No. 120) The court elected to give the Tennessee Pattern Instruction on punitive damages but included in that instruction two of the specific requests made by Ford (Docket No. 120 at 29 and 31). One such defense request, which was integrated into the Tennessee Pattern Instruction, was the fact that the jury should consider only the adverse impact of Ford's allegedly wrongful conduct "on the citizens of Tennessee." (Docket No. 120 at 31) In the briefing on this motion, Ford now maintains that the court should have given its Special Request No. 28, which states that the defendant should only be punished for "wrong done to the Plaintiffs in this case." (Docket No. 120 at 37)

In support of this present contention, the defense cites *Phillip Morris USA v. Williams*, 127 S. Ct. 1057, 166 L.Ed.2d 940 (2007). (Docket No. 159 at 19) The *Phillip Morris* case was not cited as authority for defense Request No. 28, even though the *Phillip Morris* case was

9

decided on February 20, 2007, some five months before the submission of Ford's special instruction requests on July 16, 2007. Moreoever, Request No. 28 seems inconsistent with Request No. 23, which, at the defendant's request, was given at trial. This court is of the opinion that the proper instructions were given.

**Ground 12: Michigan law should have been applied to the issue of punitive damages and, therefore, punitive damages should have been excluded.**

This legal issue was the subject of a motion in limine and was ruled on at the pretrial conference. The court's rationale for ruling that Tennessee law, rather than Michigan law, applied is set out in detail in the transcript of the pretrial conference (Docket No. 114 at 58-64), and the court declines to revisit this issue, as there is no reason to reverse the prior ruling.

**Grounds 13-15, 18**: **Even if Tennessee punitive damages law applies, the standard of proof was not met in this case and, therefore, punitive damages ought not to have been awarded.**

This court finds that, applying the standards imposed under Rules 50 and 59, FED. R. CIV. P., there was clear and convincing evidence that Ford acted recklessly so as to justify an award of punitive damages in this case. *Hodges v. S.C. Toof and Co.*, 833 S.W.2d 896, 901 (Tenn. 1992).

First, Ford entered into some fairly inculpating stipulations with the plaintiffs that were read to the jury at the close of the plaintiffs' proof. (Docket No. 157 at 94-95) Ford stipulated as follows:

1. Ford knows of many claimed incidents where individuals allegedly placed the gear shift lever in between Park and Reverse.

2. Many incidents of vehicles allegedly shifting into Reverse when not

10

>
> properly positioned into Park have been reported to Ford.

> 3. Ford had notice that vehicles can move rearward if an individual does not position the gear shift into Park.

(Plaintiffs' Ex. 10)

Second, both of Ford's experts testified that the 1999 Ford Windstar can have the gear positioned between Reverse and Park, as was the plaintiffs' contention in this case. One of Ford's experts, Frederick King, went on to testify that the gear could then slip into Reverse on its own, again as was the plaintiffs' contention in this case. Mr. King also testified that, in the 1970s, as a Ford engineer, he had investigated installing in Ford vehicles a warning system that would warn the driver when the car was not actually in Park. He testified that this warning system would have cost $3 per car, and he gave the reasons why Ford decided not to install this warning system which, in part, was due to the fact that incidents of cars being in "illusory Park" were "rare."

Frederick King, who served both as an expert witness for Ford *and* as its company representative at trial, sitting at counsel table, is an engineer who has worked for Ford for 42 years. His knowledge of this "illusory Park" phenomenon was crucial to a finding of recklessness on the part of Ford. Ford's other expert witness was a former Ford design engineer who testifies as an expert in engineering and accident reconstruction. He testified that 75 to 80 percent of his work comes from Ford Motor Company, and he candidly admitted that he had never testified that a Ford vehicle had any kind of a defect. The potential bias of Ford's only expert witnesses cannot have been lost on the jury.

Under all of these facts, this court finds that the clear and convincing standard for the award of punitive damages in this case was met.

11

**Grounds 16-17: The jury's finding that Ford was not negligent makes an award of punitive damages irreconcilably inconsistent.**

None of the cases cited by the defendant support this proposition. Moreover, Ford's own Proposed Verdict Form (Docket No. 121) allowed the jury to award punitive damages, even upon a finding of strict liability alone. Moreover, Ford never made this argument during the instruction conference or at any time before the case was submitted to the jury. Therefore, Ford has waived this argument.

In determining whether a verdict is inconsistent, the court refers to the instructions as a whole in the context of the verdict form, looking "for a reasonable way to read the answers to interrogatories as expressing a coherent and reasonable view of the case." *Morales v. American Honda Motor Co., Inc.*, 151 F.3d 500, 509 (6th Cir. 1998) (internal citations omitted). The jury was instructed, in part, that punitive damages would be appropriate if the defendant acted "recklessly," defined as being aware of, but consciously disregarding, a substantial and unjustifiable risk of injury or damage to another. (Docket No. 134 at 41) Given the proof at trial, it would not be inconsistent for the jury to have found that Ford was not negligent in its design of the Ford Windstar but that it was strictly liable for failing to give an adequate warning about illusory Park. Ford knew that this phenomenon occurred, that it could be unreasonably dangerous, that an inexpensive warning system could have been installed, and yet made the conscious decision not to install that warning system. The court finds no inconsistency in the jury's finding Ford liable under strict liability but not negligence.

**Ground 19: The punitive damages award in this case were excessive.**

The jury awarded the plaintiffs $9,000,003 in punitive damages. (Docket No. 135 at 2) This was

12

less than three times the award of compensatory damages.[4]

A review of punitive damages for gross excessiveness in violation of the Due Process Clause of the Fourteenth Amendment requires an examination of the following factors: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003) (citing *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 575 (1996).

In *State Farm*, the Court stated that the "most important indicium of the reasonableness of a punitive damages award" is the degree of reprehensibility and instructed courts to consider and weigh the following factors in making the reprehensibility determination: "the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit or mere accident. The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect." *State Farm*, 538 U.S. at 419.

Here, the harm was physical, not economic. The evidence supported a view of Ford's conduct as evincing an indifference to, or reckless disregard for, the health and safety of the

---

[4] The jury found Dawn Maggard 20 percent comparatively negligent. Therefore, the $3,300,000 compensatory damages awarded to her would be proportionately reduced.

13

drivers of their automobiles. The target of the conduct, drivers and passengers, would, in most instances, be relatively financially vulnerable. The conduct involved the repeated action of designing and manufacturing cars with the illusory Park defect, so this was not an isolated incident. This court would not view the harm as the result of intentional malice, trickery or deceit and not even mere accident on the part of Ford. The reprehensibility equation, then, has four factors in favor of the plaintiffs and one against the plaintiffs.

The second *Gore* factor is the disparity between the actual or potential harm suffered by the plaintiffs and the punitive damages award. In *Clark v. Chrysler Corp.*, 436 F.3d 594 (6th Cir. 2006), heavily relied upon by the defense, the Court found a ratio of 2:1 punitive damages to compensatory damages appropriate in a case involving physical harm, but where only one of the five reprehensibility factors weighed in favor of the plaintiff. Here, the court has found four of the five reprehensibility factors weighing in favor of the plaintiffs; therefore, a ratio of 3:1 seems very much in line with Sixth Circuit and Supreme Court precedent and guidelines.

The last *Gore* guidepost is the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. The court has little information upon which to make this assessment. The *Clark* court held that the maximum civil fine under 49 U.S.C. § 30165(a) for an automobile design defect would be $800,000 (436 F.3d at 608), and neither party disputes that. The plaintiffs point out that, effective November 1, 2000, the maximum design defect fine was raised to $15 million (Docket No. 148 at 38), and, in its reply, Ford does not dispute that. Civil penalties may also be available under Tennessee law, but neither party has cited the court to that authority. The dissent in *Clark* computes the punitive damages to comparable civil penalty ratios in *State Farm* to be 100:1 and in *Pacific Mut. Life*

14

*Ins. Co. v. Haslip*, 499 U.S. 1 (1991), to be in excess of that ratio. Here, if the maximum civil penalty were $800,000, the ratio would be approximately 10:1. If the higher maximum penalty were in effect, the ratio would be less than 1:1. The court therefore finds this factor supportive of upholding the punitive damages awarded by the jury as not excessive.

## Conclusion

In conclusion, the court can find no reason to set aside the jury's verdict in this case or to remit it in any way. Therefore, Ford's Motion For Judgment As a Matter of Law Or, in the Alternative, For a New Trial Or, in the Alternative, a Remittitur of the Jury's Verdict (Docket No. 141) is **DENIED**.

It is so **ORDERED**.

ENTER this 30th day of November 2007.

ALETA A. TRAUGER
U.S. District Judge

15